IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:18-CR-344 (DNH) |
| | ) | |
| | ) | Response in Opposition to Defendant's |
| **v.** | ) | Motion to Vacate |
| | ) | |
| **MATTHEW OSUBA,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## I.    Introduction

The Court should deny the defendant's motion without a hearing because his claims fall far short of satisfying the high burden of establishing ineffective assistance of trial counsel.

On August 9, 2019, a federal jury convicted the defendant of sexual exploitation of a child, distribution of child pornography, and possession of child pornography. On September 16, 2020, he was sentenced to 70 years in a prison. Dkt. # 166.

The defendant now claims he did not plead guilty to the sexual exploitation of a child, which carried a 15-year mandatory minimum term in prison and a 30-year maximum, because trial counsel told him the maximum sentence he could receive after trial was 30 years in prison. This claim is belied by the record, including the defendant's own statements at his sentencing. Equally without merit is the defendant's claim that trial counsel was ineffective for failing to call an expert to testify that Victim 2's abuse disclosure was coached. In support of that claim, the defendant cites to an expert's letter, which concludes it is possible the defendant abused Victim 2.

## II.    Background

### a.  Defendant's Conduct and Admissions

On August 1, 2018, the National Center for Missing and Exploited Children received a CyberTip from a woman in Norway ("Witness 1").  She reported that Kik user "Lightsabermaster," later identified as the defendant, sent her images of children engaged in sexually explicit conduct and told her that he sexually abused children, including then four-year-old Victim 2.[1]

Specifically, the defendant engaged in the following conversations, among others, with Witness 1:

| | |
|---|---|
| Witness 1: | How young is the youngest you've fucked bb? |
| Defendant: | Honestly? Won't get freaked? |
| Witness 1: | Honestly bb |
| Defendant: | 4 |
| Witness 1: | U penetrated a 4 yo? |
| Defendant: | Anal yes |
| Witness 1: | How old were u at the time? |
| Defendant: | 30 |
| Witness 1: | [Victim 2]? |
| Defendant: | No. I haven't penetrated her. |
| Witness 1: | You did other stuff with her? |
| Defendant: | A woman's daughter I was dating at the time. |
| | Long enough lol. |
| | Starting cumming on her when she was just a baby. |
| Witness 1: | Your [redacted] as well or just [Victim 2]? |
| Defendant: |  Just the girl |
| | But I did mouth fuck a 2 yo boy. |
| . . . | |
| | |
| Defendant: | [Victim 2] is here. |
| | How are you? |
| | Busy? |
| | Mommy |
| | A little pussy here |
| | Hello |
| | [sends a live image of a minor female's bare leg and food on a red blanket purported to be Victim 2] |
| | You're gonna miss the fun |
|  . . . | |

---

[1] The defendant identified Victim 2 in the chats, but the government is not doing so here to protect Victim 2's identity.

| | |
|---|---|
| Witness 1: | What did you do yesterday |
| | You were playing? |
| Defendant: | Yes |
| Witness 1: | Oh tell me about it baby |
| Defendant: | I humped her bald little pussy |
| Witness 1: | Oh yeah |
| | Did she enjoy it a lot? |
| Defendant: | She was mostly asleep |
| Witness 1: | Ok. So you didn't penetrate her then? |
| Defendant: | No |
| Witness 1: | Who was it? [Victim 2]? |
| Defendant: | Yes mama |
| Witness 1: | Did she make you cum all over her? |
| Defendant: | Yes |
| | Huge |

. . .

| | |
|---|---|
| Defendant: | When I picked her up out of the car seat I could feel her warm little pussy |
| | I laid her on the bed and… |
| Witness 1: | Oh you did? |
| Defendant: | Yes |
| Witness 1: | She like that, I bet |
| Defendant: | I started rubbing my dick on her pussy |
| | Always does |
| | Loves to sit on me with the vibrator on her clit |
| Witness 1: | What does she do when you do that? She rub you? |
| | Oh the vibrator |
| | Yeah she must be loving that! |
| | What vibrator is that? |
| | Just like mine, or? |
| | Does she put the vibrator on her cute little vagina? |
| Defendant: | Just a tiny little one with 3 speeds.  Pushes it right up inside her and grinds on me. |

. . .

| | |
|---|---|
| Witness 1: | How old was the boy you raped? |
| Defendant: | 2. |

. . .

| | |
|---|---|
| Defendant: | Under 18 I've had 2, 4, 5, 6, 8, 11, 12, 14, 16 and 17 |
| | I've had over 40 lovers 18+ |

3

Dkt. # 145, ¶¶ 13, 16.

The defendant also sent three images of child pornography to Witness 1.

After New York State Police investigators received the CyberTip, they identified the defendant as Lightsabermaster and went to his workplace on September 17, 2018. The defendant agreed to speak with agents and throughout the day made several admissions, including:

- He sent and received child pornography over the internet;

- He masturbated to the child pornography that he saw and then deleted it;

- He masturbated to images of children being raped because he is "fucked up, perverted, and had a moment of bad judgment";

- He preferred child pornography featuring young girls;

- He distributed 12-24 images of child pornography on the internet;

- He produced videos of himself masturbating next to Victim 1;

- He dated a woman with a 2-year-old son who suffered bruising to his penis from an incident that he denied involved him;

- He dated a woman with a daughter whose age matched some of the statements of sexual abuse he made online. He denied abusing her but noted that he fantasized about having sex with his girlfriend and her daughter, and that he sent non-pornographic images of the girl to others online;

- He fantasized about having sex with Victim 2 once or twice.

Dkt. # 145, ¶¶ 26-49.

In addition, the defendant agreed to take a polygraph during which deception was indicated on the questions about having prior sexual contact with children and taking pornographic images. Dkt. # 145, ¶ 37.

Agents searched the defendant's cellphone and found two videos that he made. In them, the defendant is depicted masturbating in a chair across the room from Victim 1, a then 17-year-old girl, who is laying on a couch and appears to be asleep. The defendant then walks over to

Victim 1 while still masturbating and ejaculates over her.  When confronted with those videos, the defendant admitted that he produced the videos because he "got off" to the image of seeing Victim 1 on the couch.  Dkt. # 145, ¶¶ 39, 40.

The defendant was arrested that day and charged by complaint with distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A).

### b.  The Charges, Continuing Investigation, and Trial

On October 17, 2018, a federal grand jury returned a three-count indictment charging the defendant with, in Count 1, sexual exploitation of a child, in violation of 18 U.S.C. § 2251; in Count 2, distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); and in Count 3, possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  Dkt. # 9.

### i.  Interviews of Victim 2

On September 24, 2018, Victim 2 was interviewed.  Dkt. # 145, ¶ 51.  She did not disclose any abuse at that time.  *Id.*  On April 18, 2019, Victim 2's mother reported that her son and Victim 2 had disclosed that the defendant possessed a vibrator.  Dkt. # 145, ¶ 55.  Victim 2 referred to it as a "tickle snake." Dkt. # 145, ¶ 57.

On May 13, 2019, Victim 2 and her brother were interviewed. Dkt. # 145, ¶¶ 56-57.  During this second interview, Victim 2 disclosed that the defendant used the "tickle snake" on her vagina "lots of times." Dkt. # 145, ¶ 57.  Victim 2 stated the defendant used the "tickle snake" on her at night when no one else was around.  *Id.*  She reported that one time she was wearing "kitty cat onesie pajamas" that she unzipped so "[defendant] could put the tickle snake on me." *Id.*  Victim 2 stated the "tickle snake" was underneath her underwear and touched the skin of her vagina.  *Id.*  Victim 2 drew a picture of the "tickle snake," which she stated touched the inside of her vagina.  *Id.*  She said that the defendant did not make any noise when he used the "tickle snake" on her

but that the "tickle snake" made a buzzing sound. *Id.* Victim 2 described the "tickle snake" as purple and white with a power button. *Id.* Victim 2 was five years old at the time of this interview. *Id.*

During his interview, Victim 2's brother initially denied seeing the "tickle snake" and stated "It's a lie. [Victim 2] even told me herself." Dkt. # 145, ¶ 56. Victim 2's brother then stated that he had seen the vibrator, which he described as purple and white. *Id.* He stated the defendant used it to massage the defendant's leg. *Id.* He drew a picture of the vibrator and stated "maybe" the defendant used it on Victim 2. *Id.*

### ii. Plea Discussions and Trial

The matter proceeded to trial on August 6, 2019. Prior to trial, the defendant filed two motions to dismiss the indictment, with a focus on what he argued was insufficient evidence to support Count 1. He also filed a motion to suppress his statements to law enforcement. Those motions were denied.

Approximately one week before trial was scheduled to begin, on July 29, 2019, Mr. Uba emailed me, "Do you have a plea agreement offer to resolve this case?" In responded, "If your client is willing to plead to Count 1 with a plea agreement, then I will seek approval from my supervisors for that. Please let me know as soon as possible." Dkt. # 194-3 (referred to herein as "the Plea Offer"). Mr. Uba responded that the defendant would instead be willing to plead guilty to Counts 2 and 3. *Id., see also* Exhibit A, Declaration of Vincent Uba, Esq.

I called Mr. Uba sometime after our July 31, 2019 email exchange, and asked whether the defendant would plead guilty with a conditional plea agreement (which would have required that he plead to all three counts), so that he could preserve his ability to appeal Count 1. I made clear to Mr. Uba that I was not extending that offer, but only asking whether the defendant would accept

6

it if I received approval to offer it.  Mr. Uba said that he would let me know.  Mr. Uba later called me and said that the defendant would not agree to a plea that encompassed Count 1.  *See* Exhibit A at ¶ 21.

On August 6, 2019, prior to opening statements and outside the presence of the jury, I put the Plea Offer on the record.  Mr. Uba responded that the defendant had offered to plead to Counts 2 and 3.  He noted that Count 1 carried a mandatory minimum of 15 years in prison; Count 2 carried a 5-year mandatory minimum; and Count 3 did not have a mandatory minimum.  The Court commented that it was obvious why the defendant would reject the Plea Offer.   Dkt. # 121 at 49:11-50:25.

The jury convicted the defendant of all three counts on August 9, 2019.  Sentencing was adjourned multiple times, in part due to the Covid-19 pandemic.

### iii.  Presentence Investigation Report and Sentencing

On August 28, 2020, the final presentence investigation report (PSR) was filed.  Dkt. #145.  The defendant received a copy of the PSR, reviewed it, discussed objections to it with trial counsel, and provided an affidavit to the Court detailing his objections.  Dkts. # 155, 194-7, Exhibit A at ¶ 32.

The PSR detailed interviews of Victim 1, Victim 1's brother, an ex-girlfriend and her daughter, both interviews of Victim 2 (summarized above) and both interviews of Victim 2's brother (summarized above).  Dkt. # 145, ¶¶ 50-58.  The PSR included the following facts:

- In her first interview, Victim 2 did not disclose abuse, *id.* at ¶ 51;

- Victim 1 and Victim 1's brother did not disclose abuse, *id.* at ¶ 52;

- In his second interview, when asked about a vibrator, Victim 2's brother stated "That's [Victim 2].  It's a lie.  She even told me so herself." *id.* at ¶ 56;

7

- An ex-girlfriend's daughter did not disclose abuse, *id.* at ¶ 58.

The PSR also outlined information related to a 2016 investigation in Poughkeepsie that resulted from the son of the defendant's then-girlfriend suffering bruising to his penis. *Id,* ¶120. During that investigation, a doctor noted that the bruising was indicative of sexual abuse involving compression and sucking of the penis. *Id.* The defendant cooperated with law enforcement and stated the boy's mother had physically abused him. *Id.* The PSR noted that the police determined there was insufficient evidence to charge anyone with a crime. *Id.*

### 1. U.S.S.G. 4B1.5.

At Sentencing, the District Court found a five-level enhancement to the sentencing guidelines applied pursuant to 4B1.5. As outlined in the PSR,

> Specifically, on at least two occasions, the defendant engaged in the sexual exploitation of a minor when he produced child pornography videos and/or still images of Victim 1. *Additional, though not necessary for application of the enhancement as the sexual exploitation of Victim 1 occurred on at least two occasions*, it is noted the defendant also engaged in the sexual abuse of [Victim 2] on several occasions (per her statement, "lots of times") by using a vibrator on her vagina. Therefore, a preponderance of the evidence supports that the defendant is a repeat and dangerous sex offender against minors.

Dkt. # 145*, ¶* 104 (emphasis added). Without Victim 2's disclosure, the guidelines would have remained the same because the defendant's exploitation of Victim 1 occurred on at least two occassions.

### 2. Additional Evidence

The PSR described child pornography found on the defendant's cellphone and laptop, including multiple images of Victim 1 and search terms like "cum on sleeping daughter," "cum on daughter's toothbrush" "fucking baby crying," and "really small girl porn." Dkt. #145*, ¶¶* 60-70. The defendant had videos that appear to have been self-produced at his ex-girlfriend's house in

8

one of her daughter's bedrooms. In one video, the defendant walks around the room masturbating and going through clothes around the room. *Id.* He picks up girl's underwear and continues to masturbate. *Id.* He zooms in on the underwear, masturbates into them, rubs the crotch of the underwear with his fingers, and smells them. *Id.* In a second video, he continues walking around the room masturbating then zooms in on a picture of the ex-girlfriend's daughter. *Id.* He ejaculates into a pile of the girl's clothing on the floor. *Id.*

### 3. Penalties

The PSR outlined the penalties the defendant faced and the applicable guidelines. Dkt. #145. The defendant received a copy of the PSR and reviewed it. Dkt. #155, 194-7. Mr. Uba advised the defendant of the maximum applicable penalties. Exhibit A at 32.

## III.    Law

### a.    Law Governing Motions Under 28 U.S.C. § 2255.

A collateral attack on a final judgment in a federal criminal case is "generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)). "The reasons for narrowly limiting the relief permitted under § 2255—a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place— are 'well known and basic to our adversary system of justice.'" *Bokun*, 73 F.3d at 12 (quoting *United States v. Addonizio*, 442 U.S. 187, 184 & n.11 (1979)). It is the movant's burden to establish an entitlement to relief under § 2255 by a "preponderance of the evidence." *Vargas v. United States*, 951 F. Supp. 2d 531, 549 (S.D.N.Y. 2013); *see Napoli v. United States*, 45 F.3d

680, 683 (2d Cir. 1995) ("The burden therefore falls upon petitioners to demonstrate their entitlement to relief under § 2255 in this case based on 'an error of law that constitutes "a fundamental defect which inherently results in a complete miscarriage of justice."'").

Generally, a § 2255 motion is subject to a one-year time limitation that "runs from 'the date on which the judgment of conviction becomes final.'" *Clay v. United States*, 537 U.S. 552, 524 (2003) (quoting 28 U.S.C. § 2555(f)(1)). The instant motion is timely.

Procedurally, § 2255 first requires the defendant to file a motion which "sets forth his or her legal and factual claims, accompanied by relevant exhibits: *e.g.*, an affidavit from the petitioner or others asserting relevant facts within their personal knowledge and/or identifying other sources of relevant evidence." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). Simply filing a § 2255 motion does not automatically entitle a defendant to an evidentiary hearing; to warrant an evidentiary hearing "the 'application must contain assertions of fact that a petitioner is in a position to establish by competent evidence . . . Airy generalities, conclusory assertions and hearsay statements will not suffice . . . .'" *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (quoting *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)).

The district court has the authority to dismiss a § 2255 motion without a hearing if the record conclusively establishes that the defendant is not entitled to relief. 18 U.S.C. § 2255; *see also Pham v. United States*, 318 F.3d 178, 184 (2d Cir. 2003) (the district court is entitled to rely on court records, affidavits, and letters in determining a motion to vacate). "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." *Puglisi*, 586 F.3d at 213 (quoting Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b)).

### b. Law Governing Claims of Ineffective Assistance.

To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1987).  Failure to satisfy either prong is fatal.  *Id.* Under the first prong, the defendant must first demonstrate that his counsel's performance "fell below an objective standard of reasonableness." *Id.*   In assessing counsel's performance, the conduct in question should be viewed from counsel's perspective, without the distorting effects of hindsight." *Id.* at 689; *see also United States v. Jones*, 918 F.2d 9, 11 (2d Cir. 1990).   The objective is not to grade counsel's performance, but to ascertain whether the performance has caused an unreliable outcome. *Strickland*, 466 U.S. at 696-97.

A petitioner must identify specific acts or omissions which reveal that counsel did not provide "reasonably effective assistance," *Strickland*, 466 U.S. at 687, as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Counsel is presumed to have provided effective assistance, and the petitioner has the burden to show otherwise. *Strickland,* 466 U.S. at 689.

"Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won..... [T]he threshold issue is not whether [counsel] was inadequate; rather, it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc) (emphasis in original; internal citation omitted).

*Strickland's* second prong focuses on the "reasonable probability" of prejudice, that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* 466 U.S. at 694; *see also Rega v. United States*, 263 F.3d 18, 26 (2d Cir. 2001) (district court committed clear error in finding that counsel's refusal to let defendant testify prevented his

acquittal, given that "his testimony would have done more harm than good."). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. However, "the likelihood of a result more favorable to the defendant must exclude the possibility or arbitrariness, whimsy, caprice, 'nullification,' and the like." *Id*. at 695.

The prejudice prong need not be considered if a defendant has failed to demonstrate that counsel performed below an objective standard of reasonableness. *United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994). Conversely, a court may consider the question of prejudice first because it is often "easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice." *Strickland*, 466 U.S. at 697; *see also Herring v. New York*, 422 U.S. 853 (1975).

## IV.    The Defendant Did Not Receive Ineffective Assistance of Counsel.

The defendant asserts trial counsel was ineffective for advising him "to reject the government's plea offer" and for failing to hire an expert to review Victim 2's videotaped statement in connection with sentencing. Neither assertion meets Osuba's burden.

### a.    Plea Negotiations

In the plea context, counsel renders deficient performance if he provides legally incorrect or unreasonable advice about whether to accept the plea offer, *Lafler v. Cooper*, 132 S.Ct. 1376, 1387 (2012). "Counsel must advise a client regarding a plea offer, although counsel's choice of how to do so will be guided by many factors, including the duty to avoid coercing a plea from an unwilling client." *Raysor v. United States*, 647 F.3d 491, 496 (2d Cir. 2011).

The defendant claims that Mr. Uba informed him of the Plea Offer but failed to advise him that the maximum sentence he could receive after trial was 70 years. The defendant asserts he would have pled guilty to Count 1 if he had known that he faced up to 70 years after trial, but that assertion is belied by his own statement at sentencing where he admitted "I went to trial because I

didn't agree with the statutes.  The statutory law." Dkt # 173 at 24.  The defendant reiterated this sentiment in his interview for the PSR when he noted "he is optimistic the outcome of his post-trial motions will be favorable."  Dkt. #145, ¶ 129.

Mr. Uba's detailed declaration demonstrates that he informed the defendant multiple times of the maximum potential penalties; explained that he researched similar cases and expected the defendant to likely receive a sentence around 30 years after trial; and told the defendant that he could not guarantee any specific outcome. Exhibit A.  The defendant told the Court at sentencing that he reviewed the PSR with Mr. Uba, which contained the maximum penalties, mandatory minimum penalties, and guidelines calculations.  Dkt. # 173 at 4.  He further stated that he did not have any objections that Mr. Uba had not already addressed.  *Id.*

The defendant repeatedly refused to accept responsibility for Count 1.  He admitted at sentencing what Mr. Uba's declaration establishes he believed all along—that masturbating and ejaculating over a sleeping child did not amount to a crime, let alone one warranting a 15-year mandatory minimum sentence.  The defendant's self-serving affidavit, Dkt. # 155, which is belied by the record, fails to demonstrate that counsel performed below an objective standard of reasonableness.  Accordingly, the Court need not address whether the defendant was prejudiced by his refusal to plead to Count 1.

### b.  Sentencing Expert

In support of his argument that trial counsel was ineffective for failing to hire an expert, the defendant submitted a report from an expert that says "[*W]e cannot tell* whether [Victim 2] was reporting experienced events from memory or imagined possible events suggested by the mother in conversations with [Victim 2]." Dkt # 194-4 at 2 (emphasis added).  The expert explains, "*Although it is possible that the incidents occurred*, it is clear that there was substantial *potential*

13

for contamination of [Victim 2's] account and *it is impossible to tell* how much the allegations were contaminated through discussions with mother and/or others." *Id*. at 4. (emphasis added).

The defendant's claim falls woefully short of establishing he was prejudiced by Mr. Uba's decision not to produce such testimony. *Strickland's* second prong focuses on the "reasonable probability" of prejudice, that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* 466 U.S. at 694; *see also Rega v. United States*, 263 F.3d 18, 26 (2d Cir. 2001) (district court committed clear error in finding that counsel's refusal to let defendant testify prevented his acquittal, given that "his testimony would have done more harm than good."). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. However, "the likelihood of a result more favorable to the defendant must exclude the possibility or arbitrariness, whimsy, caprice, 'nullification,' and the like." *Id*. at 695.

It is well-settled that "[t]he court must find facts relevant to a sentencing enhancement by a preponderance of the evidence." *United States v. Osuba*, 67 F.4th 56, 65 (2d Cir. 2023). As the Second Circuit explained, "several pieces of evidence supported" the District Court's finding that the defendant abused Victim 2:

> [The defendant] admitted to investigators that he fantasized about having sex with [Victim 2]. Over Kik, he gave [Witness 1] graphic details of his abuse (which she passed on to investigators). [Victim 2] confirmed [the defendant's] claims when she told investigators about episodes of sexual contact with [the defendant], the details of which tracked [the defendant's] messages to [Witness 1]. And [Victim 2's] brother partially corroborated [Victim 2's] statements when he described [the defendant's] use of a device that matched the description given by [Victim 2].
>
> . . .
>
> It is true that [Victim 2] initially told interviewers that no one had ever touched her inappropriately, and that [her brother] initially described the story of the device as a 'lie.' But it is hardly surprising that young children would be reluctant to describe sexual abuse when first asked about it.

14

*Osuba,* 67 F.4th at 66.

The materials the District Court reviewed in connection with sentencing covered all the facts the defendant cites as support, including that Victim 2 did not initially disclose the abuse, agents did not seize a vibrator from his residence, Victim 2's mother allegedly had a motive to coach her to make the disclosure, and the defendant denied the abuse.  The District Court nonetheless found by a preponderance of the evidence that the defendant abused Victim 2.  There is no "reasonable probability" that the "result of the proceeding would have been different" had an expert testified to the conclusion that the defendant may or may not have abused Victim 2. *Strickland*, 466 U.S. at 694.  Regardless, as explained above, the guidelines would have been the same due to the defendant exploiting Victim 1 on multiple occasions.

## V.    Conclusion

For the foregoing reasons, the defendant's motion should be denied.


CARLA B. FREEDMAN
United States Attorney


By:    /s/ Katherine Kopita
Katherine Kopita
Assistant United States Attorney
Bar Roll No. 517944


## CERTIFICATE OF SERVICE

I hereby certify on February 7, 2025, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel for the defendant.

*/s/ Katherine Kopita*
Katherine Kopita
Assistant United States Attorney